United States Court of Appeals,

Eleventh Circuit.

No. 96-2227.

TALLAHASSEE MEMORIAL REGIONAL MEDICAL CENTER, Florida Hospital Medical Center, Plaintiffs-Appellees,

v.

Douglas COOK, as Director of the Agency for Health Care Administration, Defendant-Appellant,

Keystone Peer Review Organization, Inc., a foreign corporation licensed to do business in Florida, H. James Towey, Secretary, The Department of Health and Rehabilitation Services, Defendants.

April 8, 1997.

Appeal from the United States District Court for the Northern District of Florida. (No. 93-40463MMP), Maurice M. Paul, Chief Judge.

Before DUBINA and BLACK, Circuit Judges, and COHILL[*], Senior District Judge.

PER CURIAM:

This is a Boren Amendment challenge under 42 U.S.C. § 1396a(a)(13)(A). We affirm on the basis of the well-reasoned district court order published in the Medicare & Medicaid Guide at page 44,212, and attached as Appendix A, with the following exceptions.

We vacate paragraph four of the "Ordered and Adjudged" section, which reads as follows:

> Defendant AHCA, through the Florida Legislature, is directed to amend Florida's Medicaid plan in such a way as to be non-violative of the Boren Amendment—namely, Florida's Medicaid must be amended to include reimbursement for inappropriate level of care services.

---

[*]Honorable Maurice B. Cohill, Jr., Senior U.S. District Judge for the Western District of Pennsylvania, sitting by designation.

*See* U.S. Const. amend. XI.  We also vacate the language of the opinion that reads as follows:  "As such, the Florida Legislature must amend its Medicaid plan to include reimbursement for medically necessary inappropriate level of care services, to bring the Medicaid into compliance with federal law."  *Id.*

We vacate the language of the opinion that reads "pending the adoption of such reimbursement provision by the Florida Legislature."  *Id.*

We further vacate the language of the opinion that reads as follows:  "The interim rates shall remain in effect until such time as the Florida Legislature adopts a permanent inappropriate level of care reimbursement provision."  *Id.*

AFFIRMED in part and VACATED in part.

APPENDIX A

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA,
TALLAHASSEE DIVISION


TALLAHASSEE MEMORIAL REGIONAL

MEDICAL CENTER, INC., and

FLORIDA HOSPITAL MEDICAL CENTER,


Plaintiffs,

v.


DOUGLAS COOK, et al.,

Defendants.

CASE NO. TCA 93-40463-MMP

*FINDINGS OF FACT AND CONCLUSIONS OF LAW*

PAUL, Chief Judge.

This is a Boren Amendment challenge under 42 U.S.C. § 1396a(a)(13)(A). Plaintiffs in this action are two hospitals, Tallahassee Memorial Regional Medical Center, Inc. ("TMRMC"), located in Tallahassee, Florida and Florida Hospital Medical Center ("FHMC"), located in Orlando, Florida, which are fully qualified to provide in-patient psychiatric care for adults and adolescents under Florida's Medicaid program. Defendant Douglas Cook is the Director of the Florida Agency for Health Care Administration, the single designated agency responsible for the operation of Florida's Medicaid program. *See* 1993 Fla.Laws ch. 93-129, § 58; Fla.Admin.Code Ann. r. 59G-4.150(1)(b), r. 59G-4.160(1)(c) (1994). Plaintiff also named as defendants H. James Towey, Secretary of the Florida Department of Health and Rehabilitative Services ("HRS"), and Keystone Peer Review Organization ("KEPRO"), a non-profit corporation under contract by AHCA to review Medicaid claims for adolescent psychiatric patients. These defendants were dismissed in the Court's January 12, 1995 order (Doc. 67).

A two day bench trial was concluded in this matter on August 15, 1995. The Court now sets out its findings of fact and conclusions of law based upon all admissible evidence presented at trial, or otherwise contained in the record.

I. THE PARTIES' POSITIONS:

A. Plaintiffs' Claims:

The State pays the Plaintiffs an established per diem rate for the days in which medically necessary, in-patient psychiatric care is provided to adolescent patients. Plaintiffs do not dispute the

adequacy of these rates per se, as they directly coincide with the number of medically necessary days for each patient. However, when the medical necessity for in-patient services ends, the patients medically require a discharge into an alternative setting facility—*not* to their homes or elsewhere. AHCA does not dispute the need for these patients to be thus placed, and it compensates the alternative facilities with Medicaid dollars. However, due to insufficient funding by the State for these alternative settings and bureaucratic admission hurdles, patients often have to wait weeks or even months for an opening in such a facility. In the meantime, the hospitals cannot discharge the patients, even though in-patient care is no longer medically necessary. KEPRO, and ultimately, AHCA, denies *any* reimbursement for these "grace days."

Plaintiffs concede that AHCA cannot be required to build additional facilities. However, Plaintiffs assert that it is AHCA's responsibility to provide for a scheme of reimbursement under the state Medicaid plan so that patient retention by the hospitals is compensated at an appropriate rate when medical necessity for in-patient care ceases to exist, yet the patients—through no fault of the hospitals—cannot be discharged as an outpatient or to the home, but have no alternative facility available. Plaintiffs argue that the state's inefficiencies in its plan—and the fiscal impact of those inefficiencies—have been transferred from the state to the hospitals. According to Plaintiffs, since July 1992, the fiscal impact of the recoupment or anticipated recoupment required by KEPRO's denial of reimbursement for adolescent psychiatric "grace days" is $836,896.13 for TMRMC,

and $389,754.00 for FHMC. Plaintiffs conclude that the resulting impact on hospital daily per diem rates violates the Boren Amendment requirements.

Plaintiffs contend that the State's Medicaid plan fails to comport with the requirements of the Boren Amendment in two respects: First, Plaintiffs maintain that the Florida plan does not reimburse hospitals for "administrative" or "grace days" [1] contrary to the mandatory language of 42 U.S.C. § 1396a(a)(13)(A), which specifies that "in the case of hospital patients receiving services at an inappropriate level of care" a State plan must provide "for lower reimbursement rates reflecting the level of care actually received." Second, Plaintiffs assert that because of flaws in the State plan which result in the unavailability of alternative setting care for adolescent psychiatric patients upon discharge from the hospital, the hospitals are required to retain such patients within their facilities beyond the point of medical necessity. The State then disallows any reimbursement for the "grace days" between the time medical necessity ends and the day that discharge to an alternative setting is possible, because there is no medical necessity for in-patient services during this waiting period. Thus, under the guise of disallowing compensation for lack of medical necessity, the State effectively shifts the fiscal impact of its flawed Medicaid program to the hospitals, resulting in hospital per diem reimbursement rates which are diluted to such

---

[1] *See generally* Fla.Admin.Code R. 59G-4.150(1)(a) (defining such days as "days a patient remains in the hospital beyond the point of medical necessity while awaiting placement in a nursing home or other place of residence").

an extent that they are not "reasonable and adequate to meet the costs ... of efficiently and economically operated facilities," contrary to the Boren Amendment requirements.[2]

Plaintiffs therefore seek an injunction pursuant to the Boren Amendment to Title XIX, 42 U.S.C. § 1396a(a)(13)(A), and 42 U.S.C. § 1983, against the continued operation by the State of this portion of its Medicaid plan and further seek a declaratory judgment holding that the State must reimburse Plaintiffs for adolescent psychiatric patient "grace days," at a rate reflective of the level of care received by the patients during the grace period.

B. Defendant AHCA's Case:

AHCA first asserts that there is no case or controversy. Defendant contends it has not recouped any money previously paid to Plaintiffs for in-patient adolescent psychiatric care provided to Medicaid recipients, but later determined by KEPRO to be not "medically necessary"—in other words, recoupment for "administrative" or "grace days." According to Defendant, it has not yet determined whether to recoup funds from Plaintiff TMRMC. Furthermore, Defendant points out that Plaintiff FHMC has a pending request for a formal administrative hearing to contest Defendant's determination that FHMC was overpaid for rendering services to eight (8) Medicaid recipients[3]. As a result, Defendant concludes

---

[2]In other words, "[d]enials are the method used by ... AHCA to compensate for lack of funding by the State when in fact, the Boren Act ... requires reimbursement" for the psychiatric services Plaintiffs are providing (Compl. at ¶ 23).

[3]Defendant represents that Plaintiff FHMC has conceded that two (2) of these patients are placement issues.

that Plaintiffs have not suffered any monetary damage, any prospective damages to or suffered by Plaintiffs are too speculative, and Plaintiffs have not exhausted their administrative remedies pursuant to Florida Statutes Chapter 120. Consequently, Defendant would have the Court hold that there has been no actual dilution in either Plaintiff's Medicaid per diem rates and, therefore, there is no violation of the Boren Amendment.

Second, AHCA maintains that HRS, not it, is the proper defendant in this action. Defendant asserts that HRS delays placement of Plaintiffs' adolescent psychiatric patients in outpatient facilities, either because of administrative delays by HRS or the failure of HRS to provide an adequate number of such facilities[4]. Furthermore, Defendant contends that: (1) a substantial number of the adolescent patients in question are in the custody of HRS; or (2) the adolescent patients in question are still a danger to themselves or others fall and within the care of HRS under Florida's Baker Act[5]. Defendant therefore concludes that HRS is responsible for the reimbursement problems at issue in this case, and that Plaintiffs have therefore not proven any Boren Amendment violations.

AHCA next asserts the inappropriate level of care

---

[4]Defendant also points out that pursuant to Florida Statutes Chapter 394, HRS is the designated state agency responsible for ensuring there are adequate adolescent psychiatric care facilities available. On the other hand, Defendant points out that it is only authorized to disburse Medicaid payments for "medically necessary" services.

[5]*See* Fla.Stat. § 394.451 (1994), *et seq.* ("The Florida Mental Health Act," which provides procedures for commitment of individuals).

reimbursement provision of the Boren Amendment is optional, and that Florida has not elected to provide such coverage[6]. In the absence of inappropriate level of care coverage, Defendant states that medical necessity, or the lack thereof, is the only pertinent criterion for determining the compensability of the "grace days." Since Plaintiffs do not dispute that in-patient psychiatric care is not "medically necessary" for the adolescent patients in question, Defendant argues the hospitals cannot be reimbursed under Florida's Medicaid for the "grace days" at issue. Accordingly, Defendant would have the Court hold that Plaintiffs have failed to demonstrate a violation of the Boren Amendment.

AHCA also argues that the Boren Amendment provides, by definition, that the Plaintiff hospitals are not efficiently operated when they continue to treat patients beyond medical necessity—i.e., when in-patient care is no longer "medically necessary" for the adolescent psychiatric patients in question. Defendant therefore states that its failure to pay Plaintiffs for such services does not violate the Boren Amendment.

Finally, AHCA states that Medicaid per diem rates are established by it only after a hospital provider submits its cost of care (including "charity" care), which is then divided by the reimbursable Medicaid days to produce a per day/per bed cost for the provider. Defendant reasons that even if this case raises a Boren Amendment issue, the amount of the services not directly paid to Plaintiffs will be recalculated as part of the "charity" care

_____

[6]Defendant represents that it is willing to elect inappropriate level of care services, subject to authorization and appropriate funding by the Florida Legislature and HCFA.

when any subsequent per diem rates are set.  Hence, no Boren

Amendment violation has occurred.

II. FINDINGS:

The factual matters of this case are largely undisputed.  The

parties merely differ in their conclusions of whether a Boren

Amendment violation has been demonstrated.  The Court now makes the

following findings of fact and law:

A. Florida's Medicaid System:

The Medicaid Act, Title XIX of the Social Security Act, is a

cooperative federal-state program designed to allow states to

receive matching funds from the federal government to finance

medical services to certain low-income persons. *Schweiker v. Gray

Panthers,* 453 U.S. 34, 36, 101 S.Ct. 2633, 2636, 69 L.Ed.2d 460

(1981).  States may voluntarily choose to participate in the

Medicaid program.  *See* 42 U.S.C. § 1396b(a).  When a state, like

Florida, has elected to participate in the Medicaid program[7], it

must provide certain services[8], including early and periodic

screening, diagnostic, and treatment services ("EPSDT") for

---

[7]*See* Fla.Stat. §§ 409.901-409.920 (1991);  Fla.Admin.Code
ch. 59G.  Under the Florida program, the state contributes 44% of
the funds for indigent care, with the remaining 56% being
contributed by the federal government.

[8]In addition to EPSDT, these services include the following:
(1) Inpatient and outpatient hospital services;  (2) Rural health
clinic services;  (3) Laboratory and x-ray services;  (4) Skilled
nursing facilities services for individuals 21 years of age and
older;  (5) Family planning services for individuals of
child-bearing age;  (6) Physician services;  (7) Home health
services for individuals who are entitled to receive skilled
nursing facilities services;  (8) Nurse midwife services;  and
(9) Transportation to receive medical care.

qualified aid recipients under age twenty-one[9].

In Florida, EPSDT services include in-patient psychiatric hospital services for individuals under age twenty-one[10], such as those provided by Plaintiffs. Federal law does not appear to require states to provide in-patient psychiatric treatment in their EPSDT programs. *See* 42 U.S.C. § 1396d(r); 42 C.F.R. § 441.56(c). However, even when a state elects to provide an optional service, that service becomes part of the state Medicaid plan and is subject to the requirements of federal law. *See Sobky v. Smoley,* 855 F.Supp. 1123, 1127 (E.D.Cal.1994) (collecting citations). In-patient psychiatric care must therefore be provided by the hospitals to their patients as long as medical necessity exists[11]. An adolescent Medicaid recipient in an acute care facility is entitled to receive full hospital services of room, board, medical supplies, diagnostic and therapeutic services, use of the hospital facilities, drugs, nursing care, and all supplies and equipment necessary to provide care (Pretrial Stipulation, Doc. 89). There

_____

[9]*See* 42 U.S.C. §§ 1396d(a)(16), 1396d(h); Fla.Admin.Code Ann. r. 59G-4.080 (1994). *See generally* Fla.Stat. § 409.905(2) (the state "shall pay for early and periodic screening and diagnosis of a recipient under age 21 to ascertain ... mental problems and conditions and provide treatment to correct or ameliorate these problems and conditions....").

[10]*See* Fla.Stat. § 409.905(1); Fla.Admin.Code Ann. r. 59G-4.080 ("Medically necessary follow-up treatment that is available through Medicaid includes ... community mental health services."). The federal guidelines for state EPSDT inpatient psychiatric services are outlined in 42 C.F.R. §§ 441.150-.182 (1994).

[11]The term "medical necessity" is defined in the Code of Federal Regulations and at Fla.Admin.Code r. 59G-1.010(167), and is a part of the regulations adopted by Florida when the state made its election to participate in the federal Medicaid program.

are no financial caps imposed upon such services when provided to patients under the age of 21 years.  *See* Fla.Stat. § 409.908(1)(a).

Moreover, in administering EPSDT programs, participant states, such as Florida, must comply with the Medicaid regulations, particularly the 62 conditions set forth in 42 U.S.C. § 1396a(a)[12]. Specifically, the Boren Amendment[13] to Title XIX dictates that although administration of Medicaid plans is the responsibility of the states, a participating state must make payments for hospital services

> through the use of [reimbursement] rates ... which the State finds, and makes assurances satisfactory to the Secretary [of HHS], are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws ... and to assure that individuals eligible for medical assistance have reasonable access ... to in-patient hospital services of adequate quality....

---

[12]*See, e.g., Illinois Health Care Ass'n v. Bradley,* 983 F.2d 1460, 1461 (7th Cir.1993), and cases cited therein.

[13]The Boren Amendment was enacted in 1980 as part of the Omnibus Budget Reconciliation Act ("OBRA") of 1980, Pub.L. No. 96-499, § 962(a), 94 Stat. 2599, 2650 (1980), and originally only set the standard for reimbursement of nursing and intermediate care facilities.  In 1981, Congress applied the same standard for reimbursement to hospitals.  OBRA of 1981, Pub.L. 97-35, § 2173, 95 Stat. 808 (1981).

> Congress passed the Boren Amendment in response to rapidly rising Medicaid costs.  The Amendment was designed to minimize the inflationary spiral caused by the existing complex and rigid reimbursement regulations.  Congress gave the states greater flexibility in calculation of reimbursement rates in order to promote efficient and economical delivery of services.  Under the Amendment, participant states could adopt prospective reimbursement rates, based on their own formulation of what the services could cost.  Federal oversight was primarily limited to determination of the reasonableness of the states' assurances for what the medical services should cost. *See Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 506-08, 110 S.Ct. 2510, 2515-17, 110 L.Ed.2d 455 (1990).

42 U.S.C. § 1396a(a)(13)(A). In other words, a participant State must do two things to be in compliance with the Boren Amendment: first, ensure individuals have "reasonable access" to facilities of "adequate quality"; and second, reimburse health care providers in a manner that is "reasonable and adequate" to meet the costs of "efficiently and economically operated" facilities. The Secretary of HHS, through the Health Care Financing Administration ("HCFA")[14], then either approves or disapproves the State's proposed reimbursement system. *See* 42 U.S.C. § 1396a(b).

In Florida, AHCA establishes and applies the methodology for determining the per diem rate that a hospital receives for psychiatric medicaid patients[15]. This formula is based upon allowable cost and divided by allowable days, which results in the per diem rate for each individual hospital. The per diem rate is not determined for each service in a hospital which the hospital provides or performs, but is an average of all services provided in that hospital from a prior year plus an inflation factor for the current year; therefore, the per diem rate is different for each hospital, and will change every year. Since the Medicaid hospital reimbursement rate reflects an average cost of all hospital services for each facility, the rate over-compensates for some services and under-compensates for other services (Pretrial Stipulation).

A state agency with oversight over an approved Medicaid

---

[14]42 C.F.R. § 430.10 (1994).

[15]The Agency For Health Care Administration took over the reimbursement part of the Medicaid Program for Florida in 1993 (Pretrial Stipulation, Doc. 89).

reimbursement system[16] is authorized to contract with peer review organizations ("PROs") to carry out its duty to promote "the effective, efficient, and economical delivery of health care services ... and the quality of services of the type for which [Medicaid] payment may be made." 42 U.S.C. § 1395y(g). *See also id.* at § 1320c-7(a) (authorizing states with approved Title XIX plans to contract functions to PROs). PROs are only permitted to recommend making Medicaid payments for services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." *See* 42 U.S.C. § 1395y(a)(1)(A). In addition, in determining whether Medicaid services are necessary, PROs must review

> some or all of the professional activities in the area ... of institutional ... providers of health care services in the provision of health care services and items for which payment may be made ... for the purpose of determining whether ... (A) such services and items are or were reasonable and medically necessary ...; (B) the quality of such services meets professionally recognized standards of health care; and (C) in case such services and items are proposed to be provided ... on an in-patient basis, such services and items could, consistent with the provision of medical care, be effectively provided more economically on an outpatient basis or in an in-patient health care facility of a different type.
>
> ....

42 U.S.C. § 1320c-3(a)(1). The PRO determines through its review whether Medicaid payments are to be made for the services reviewed. 42 U.S.C. § 1320c-3(a)(2). The PRO's determination is conclusive, unless the "determination is changed as the result of any hearing or review of the determination." 42 U.S.C. § 1320c-3(a)(2)(C).

---

[16]A single state agency must be established or designated to administer or to supervise the administration of state Medicaid plan. *See* 42 U.S.C. § 1396a(a)(5).

*See id.* at § 1320c-4.

KEPRO is under contract with the State of Florida for this purpose. On a retrospective basis, KEPRO reviews provider claims, utilizing criteria which have been established by the State of Florida, to determine whether payment for the services should be allowed, disallowed or allowed for a reduced number of days. Florida's Agency for Health Care Administration ("AHCA"), relying on the KEPRO determination, makes the final decision regarding reimbursement for the services. In the meantime, the provider receives reimbursement for the services provided on a monthly basis, so at the end of the fiscal year, if there has been an adverse determination by KEPRO so that certain days or admissions are denied, AHCA sends a recoupment letter to the provider requesting that payment be disgorged. The provider either repays the state, or funds are deducted from future payment, after administrative remedies are exhausted.

Florida does not reimburse providers in any amount for what it terms "administrative" or "grace days," which are defined by regulation as "days a patient remains in the hospital beyond the point of medical necessity while awaiting placement in a nursing home or other place of residence." Fla.Admin.Code r. 59G-4.150(1)(a).

On the other hand, Florida reimburses Plaintiffs and the 23 other Medicaid providers of in-patient hospital care for the provision of medically necessary psychiatric treatment to these patients. Florida also reimburses providers of medically necessary psychiatric care in alternative, lower level care facilities once

the medical necessity for in-patient treatment ends[17].  However, due to organizational[18] or funding deficiencies in the state's medical assistance program, there is an extreme shortage of available spaces at alternative care facilities for the adolescent psychiatric patients.

B. The Case At Bar:

Plaintiffs have therefore repeatedly found themselves forced into the posture of retaining and caring for adolescent psychiatric patients after the medical necessity for in-patient, acute care services ceases, because treatment at an alternative facility was medically necessary for the patient, but placement in such an alternative setting was impossible or greatly delayed.  Under these circumstances, the Plaintiffs may not discharge the patients to the home, since they are not medically able to return to such an unsupervised setting.  In addition, as Medicaid providers, the

---

[17]The State has established or approved certain alternative settings for psychiatric Medicaid patients, and the Agency reimburses for services in entities which are approved as alternative settings for these patients for the medically necessary services provided therein (Pretrial Stipulation, Doc. 89).

[18]In addition to the frequent unavailability of bed space in alternative setting facilities when needed by the adolescent patients, there is an evaluation process which must take place prior to patient placement in the alternative setting.  If a Medicaid psychiatric patient is discharged because medical necessity no longer exists, then before a Medicaid psychiatric patient can be eligible for placement in an alternative setting, the process requires that the person be evaluated by the Case Review Committee ("CRC"), a committee of Social Services Health Care Professionals that is funded by HRS.  The usual procedure for the CRC is that this committee meets on a monthly basis and approves placement, which may take weeks, months, or be intermediate.  Due to the infrequency of the CRC meetings, additional delays are often experienced in placing the adolescent psychiatric patient in an alternative setting.

Plaintiffs cannot discriminate against adolescent psychiatric patients at the point of admission, even though the providers are aware of the possibility or likelihood of an extended period of "grace days" for these patients once medical necessity for in-patient services ends (Pretrial Stipulation). Thus, the hospitals are forced, through no fault of their own, to retain these patients until placement in an alternative setting is possible.

On retrospective review, KEPRO abides by Medicaid guidelines by denying Plaintiffs payment for in-patient psychiatric services for adolescents at the point those services are no longer medically necessary. However, Florida's failure to adopt a provision for payment of inappropriate level of care services causes AHCA to deny any reimbursement to the two hospitals for those "grace days," regardless of the duration the adolescent patient has to wait before an alternative out-patient setting is available. AHCA, through its denial of reimbursement to Plaintiffs for adolescent psychiatric patient "grace days," thereby shifts the deficiencies of the State's medical assistance program, and the resulting fiscal impact of the same, to the Plaintiff hospitals.

The Court heard testimony about the disproportionate number of denials by KEPRO for in-patient psychiatric services (both adult and adolescent). For example, although psychiatric Medicaid services only comprise 7.3 percent of all admissions and 15.2 percent of all patient days, they comprised 65.4 percent of all denials and 78.3 percent of all denial days (Pls.' Ex. 11). The large number of denials are probably a byproduct of the 100%

retrospective review that KEPRO does for all in-patient psychiatric services (Pretrial Stipulation). Again, however, the net effect of the large number of denials is that the Plaintiff hospitals recover only a portion of their costs of providing in-patient psychiatric care, either through immediate reimbursement by AHCA, or as reflected in the adjustment of the successive year's overall in-patient reimbursement rate.

Plaintiffs also presented evidence of the fiscal impact of the denials on each of the two hospitals.

Carl Mahler, Administrator of TMRMC's psychiatric facility, testified that 25 percent of TMRMC's psychiatric patients were on Medicaid, includes 40 percent of all adolescent patients. Mr. Mahler further stated that the average length of stay for all psychiatric patients was 12 days. Annette Hurst, Director of Utilization Management and Discharge Planning for Plaintiff TMRMC, testified that between 1989-1991, TMRMC had a total of 4 Medicaid denials out of 15 Medicaid recoupments by HRS, out of 429 psychiatric admissions[19] for the same period. Although the number of psychiatric admissions was constant, there were a total of 146 denials for psychiatric patients during the 1992-1995 period. While not all of these denials during 1992-1995 were adolescent patients, Ms. Hurst testified that the denials for adolescent patients during this period totalled over $654,000.00. As of June,

---

[19]Again, these figures include both adult and adolescent psychiatric patients receiving Medicaid. It is somewhat troubling that Plaintiffs attempt to introduce evidence of adult psychiatric patients, when the only issue before the Court is the adequacy of reimbursement for adolescent psychiatric patients. However, the Court does not find this lack of precision to be fatal to Plaintiffs' case.

1995, TMRMC had an in-patient reimbursement rate of $723.00 per patient, per day. However, AHCA had not attained any recoupment from TMRMC since 1992.

Karen Schimpf, Assistant Director of Systems Development for Plaintiff FHMC, stated that the average length of stay for psychiatric patients was 14 days[20]. FHMC had a total of $311,310.00 in recoupment denials, and $475,985.00 in reconsideration denials for all psychiatric patients[21]. Out of 9 psychiatric care cases pending before AHCA's Division of Administrative Hearings, 2 involve care for adolescent patients totalling $257,000.00. FHMC has had a total of 120 psychiatric denials through June 20, 1995, including both adult and adolescent patients. At the time of trial, FHMC's in-patient reimbursement rate was $833.90 per patient, per day. Again, it does not appear that AHCA had attained any recoupment from FHMC for the cases in question.

C. Conclusions:

Plaintiffs, as health care providers under the Florida Medicaid program, have standing to sue AHCA for declaratory and injunctive relief under 42 U.S.C. § 1983, for an alleged violation of the Boren Amendment of the federal Medicaid Act. *Wilder,* 496 U.S. at 498, 110 S.Ct. at 2510. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 to consider such a challenge.

As an initial matter, the Court rejects out of hand Defendant

---

[20]Ms. Schimpf stated that the average was 32 days for all psychiatric patients, including one patient who stayed for 573 days at a cost of more than $230,000. Without this patient, the average length of stay for psychiatric patients was 14 days.

[21]Again, these figures include $232,911.00 for the one patient noted above.

AHCA's contention that there is no case or controversy because Plaintiffs have failed to exhaust the state administrative appeals process for denials of adolescent psychiatric care by AHCA and KEPRO. It is well established that a claim under 42 U.S.C. § 1983 cannot be barred by a plaintiff's failure to exhaust state remedies with respect to unreviewed administrative actions. *E.g., Patsy v. Florida Bd. of Regents,* 457 U.S. 496, 516, 102 S.Ct. 2557, 2568, 73 L.Ed.2d 172 (1982); *Thornquest v. King,* 61 F.3d 837, 841 n. 3 (11th Cir.1995). The courts that have considered the exhaustion argument in the context of the Boren Amendment have found this rule applies with equal force to cases under the Amendment. *See, e.g., Virginia Hosp. Ass'n v. Baliles,* 868 F.2d 653, 660-61 (4th Cir.1989), *aff'd, Wilder,* 496 U.S. at 498, 110 S.Ct. at 2510; *Department of Health and Social Serv. v. Alaska State Hosp. & Nursing Home Ass'n,* 856 P.2d 755, 758 (Alaska 1993); *Indiana State Bd. of Pub. Welfare v. Tioga Pines Living Ctr., Inc.,* 575 N.E.2d 303, 307 (Ind. 4th Ct.App.1991). Moreover, even if exhaustion were required, AHCA's posture in this case indicates that reliance on administrative action would be futile because Plaintiffs' claims would likely be denied in whole or in part. *See generally Deltona Corp. v. Alexander,* 682 F.2d 888, 893 (11th Cir.1982) (no exhaustion of administrative action required where it would be futile); *Linfors v. United States,* 673 F.2d 332, 334 (11th Cir.1982) (same).

The Court similarly rejects AHCA's argument that HRS is the proper party defendant. As this Court noted in its January 12, 1995 order, the Court cannot enter any relief against HRS under a

Boren Amendment claim fashioned as a § 1983 claim because HRS is not the designated Medicaid authority for the State of Florida (*see* Doc. 67 at 14-15). In addition, the Court further found "that HRS does not promulgate rules governing Medicaid reimbursement, semireimbursement rates for Medicaid providers, or make assurances to HCFA that those rates comply with the provisions of the Boren Amendment" (*Id.* at 15). Rather, AHCA has the responsibility for each of these tasks. The Court further disagrees with AHCA's contention that Plaintiffs have a monetary recourse against HRS for all the adolescent psychiatric patients in question. The trial testimony shows that only a very small proportion, if indeed any proportion at all, of the adolescent psychiatric patients at issue would fall within the purview of HRS through the Baker Act or some other scheme. The fact that Plaintiffs' losses are exacerbated by HRS's failure to provide an adequate number of alternative outpatient facilities to which Plaintiffs can discharge these patients, does not defeat Plaintiffs' claims against AHCA under the Boren Amendment.

The Court also disagrees with AHCA's contention that the provision of "inappropriate level of care services" are optional under these circumstances. Although the federal regulation governing payment for "grace days" (which the Boren Amendment terms "inappropriate level of care reimbursement") indicates that a state's reimbursement for such time is optional, 42 C.F.R. § 447.253(b)(1)(ii)(B), the legislative history of this regulation indicates that it is mandatory under the scenario at issue before this Court. The Boren Amendment to the Medicaid Act, 42 U.S.C. §

1396a(a)(13)(A), mandates reimbursement to in-patient hospital providers who provide lower level care to patients once the medical necessity for in-patient, acute care ceases, but the required alternative care setting is unavailable. The reimbursement must be at a lower rate than that received for in-patient services, commensurate with the level of care provided.

In *Alabama Hospital Association v. Beasley,* 702 F.2d 955 (11th Cir.1983), the Eleventh Circuit expressly held that the Alabama Medicaid reimbursement plan was deficient for failing to provide for lower payment rates for patients who did not need in-patient care. *Id.* at 961-62. The *Beasley* court therefore remanded the case to the district court to impose an appropriate remedy accounting for inappropriate level of care services, without requiring the suspension of the entire state Medicaid plan. *Id.* at 962.

As the Eleventh Circuit recognized in *Beasley,* the history of 42 C.F.R. § 447.253(b)(1)(ii)(B) indicates that HCFA intended for the option of reimbursing for inappropriate level of care be available only in situations where lower level care facilities were available, but hospitals elected to retain patients in the in-patient setting beyond the point of medical necessity. 52 Fed.Reg. at 28,143 (1987); 51 Fed.Reg. at 5, 730 (1986); 48 Fed.Reg. at 56,048 (1983). The history of this rule, taken together with the mandatory language of the Boren Amendment and the holding in *Beasley,* requires that the Plaintiff hospitals be reimbursed for the "grace days" spent by adolescent psychiatric care patient in their in-patient facilities, when the sole reason

for retaining the patients in the upper level facility is the unavailability of alternative settings to which the patient may be discharged.

To the extent that the legislative history of 42 C.F.R. Section 447.253(b)(1)(ii)(B) may be read to sanction the state's refusal to reimburse the Plaintiff hospitals at any rate under this scenario, HCFA's determination is directly contrary to the express mandate of the Boren Amendment and is accordingly not entitled to deference by this Court. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). As already discussed, the Boren Amendment requires that states participating in the Medicaid program reimburse in-patient hospital providers at a rate which is "reasonable and adequate" to meet the costs incurred by "efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards ..." The wholesale failure to reimburse any monies to two in-patient providers of psychiatric care for adolescents, when such care is only medically necessary on an outpatient basis, does not comport with the strictures of the Boren Amendment.

Plaintiffs do not challenge the adequacy of the per diem rates reimbursed to them for the days in which adolescent psychiatric patients receive medically necessary in-patient services; however, Plaintiffs do assert that by denying any reimbursement to the hospitals during the "grace days" which are necessitated through no fault of the Plaintiffs, the state is so

diluting the otherwise adequate per diem rates as to make them unreasonable and inadequate to meet the costs of the efficient and economical operation of the facilities. The Court does not entirely agree with Plaintiffs on this point.

The Court disagrees with Plaintiffs' conclusion that AHCA's failure to provide reimbursement for medically necessary outpatient psychiatric services to adolescents in an in-patient setting, dilutes the in-patient per diem rate that the Plaintiffs receive. All parties stipulate that the initial in-patient per diem rate is adequate, and the Court agrees with that stipulation. The Court is simply unwilling to mix apples with oranges by saying that the per diem rate for all in-patient services must be increased to account for the lack of compensation for medically necessary outpatient services. At least one circuit has held under somewhat similar circumstances that outpatient costs should not be included in calculating reimbursement rates for in-patient services. *See New York v. Bowen,* 811 F.2d 776, 777-79 (2d Cir.1987).

Instead, AHCA has effectively created a situation where, in the absence of the inappropriate level of care compensation, in-patient psychiatric providers such as Plaintiffs are providing medically necessary outpatient psychiatric services to adolescents in an in-patient setting, but receiving an outpatient reimbursement rate of zero. The Boren Amendment applies to outpatient rates, in addition to in-patient rates. *See generally Ohio Hosp. Ass'n v. Ohio Dep't of Human Serv.,* 62 Ohio St.3d 97, 579 N.E.2d 695, 698 (1991) ("Although *Wilder* involved a challenge to per-diem charges for in-patient care, the selfsame analysis applies to the

outpatient fees involved in this case."), *cert. denied,* 503 U.S. 940, 112 S.Ct. 1483, 117 L.Ed.2d 625 (1992). *Accord, Orthopaedic Hosp. v. Kizer,* No. 90-4209, 1992 WL 345652 (C.D.Cal.1992) (same). The failure to compensate Plaintiffs at an appropriate outpatient rate therefore violates the Boren Amendment.

While the Boren Amendment was intended to grant states a greater degree of flexibility in establishing the methodology for their reimbursement rates, the amendment was "not intended to encourage arbitrary reductions in payment that would adversely affect the quality of care." S.Rep. No. 139, 97th Cong., 1st Sess. 478, reprinted in 1981 U.S.Code and Cong. & Admin.News 396, 744. In this case, due to an inadequate level of funding for inappropriate level of care services, AHCA and the State of Florida have impermissibly shifted the deficiencies of Florida's Medicaid program, and the resulting fiscal impact of the same, to the private sector hospitals. As discussed above, since Plaintiffs are qualified providers under the Medicaid Act, they cannot lawfully choose to discriminate against the adolescent patients in question by refusing to admit them on the basis that Plaintiffs may not recover all—or for that matter, any—of the costs of providing psychiatric services from AHCA. Plaintiffs are therefore left with a Hobson's choice: either accept the adolescent psychiatric patients, and risk recoupment by AHCA later on, or deny admission to the adolescent psychiatric patients and risk being in noncompliance with federal guidelines.

Defendant AHCA seems to concede that budgetary constraints and the failure of the Legislature to adopt a provision for

inappropriate level of care services, have left it incapable of compensating Plaintiffs for medically necessary outpatient psychiatric services provided in an in-patient setting.  However, as the Tenth Circuit has held:

> While budgetary constraints may be a factor to be considered by a state when amending a current plan, implementing a new plan, or making the annually mandated findings, budgetary constraints alone can never be sufficient.  *Illinois Hosp. Ass'n* [*v. Illinois Dept. of Public Aid,* 576 F.Supp. 360 at 368 (N.D.Ill.1983).]  "If a state could evade the requirements of the [Medicaid] Act simply by failing to appropriate sufficient funds to meet them, it could rewrite the Congressionally imposed standards at will."  *Alabama Nursing Home Ass'n v. Califano,* 433 F.Supp. 1325, 1330 (M.D.Ala.1977), *review and vacated in part on other grounds,* sub nom., 617 F.2d 388 (5th Cir.1980).

*AMISUB (PSL), Inc. v. Colorado Dept. of Social Serv.,* 879 F.2d 789, 800-01 (10th Cir.1989), *cert. denied,* 496 U.S. 935, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990).  Yet, this is precisely what the State of Florida has attempted to do in the case at bar.

Having found a violation under the Boren Amendment, the only remaining question is what remedy is appropriate.  There are two courses that the Court will take.

First, the Court finds that AHCA's failure to provide any reimbursement for medically necessary inappropriate level of care services constitutes a Boren Amendment violation.  The absence of such a reimbursement provision renders Florida's Medicaid plan deficient.  As such, the Florida Legislature must amend its Medicaid plan to include reimbursement for medically necessary inappropriate level of care services, to bring the Medicaid plan into compliance with federal law.  *See Beasley,* 702 F.2d at 961-62.

Second, pending the adoption of such a reimbursement provision by the Florida Legislature, Defendant AHCA is ordered to set an

appropriate outpatient rate for medically necessary outpatient psychiatric services provided to adolescent Medicaid recipients at each of the two Plaintiff hospitals. Such interim rates may be used pending the adoption of permanent reimbursement rates that are compliance with federal law. *See, e.g., Mason Gen. Hosp. v. Secretary of Dep't of H.H.S.,* 809 F.2d 1220, 1223 (6th Cir.1987); *New England Memorial Hosp. v. Rate Setting Comm'n,* 394 Mass. 296, 475 N.E.2d 740, 745 (1985). In setting the interim outpatient rate, AHCA shall use the same methodology it applies to achieve appropriate rates for non-hospital providers of such outpatient psychiatric services. *Kizer,* 1992 WL 345652, at *1. The interim rates shall remain in effect until such time as the Florida Legislature adopts a permanent inappropriate level of care reimbursement provision.

Plaintiffs will continue to receive reimbursement for medically necessary in-patient psychiatric services at their existing in-patient per diem rates. To the extent that psychiatric services for adolescent Medicaid recipients are only medically necessary at an outpatient rate, Plaintiffs shall receive reimbursement for the appropriate number of days at the outpatient rate set by AHCA.

Accordingly, it is hereby

ORDERED AND ADJUDGED:

1. The Court finds that Plaintiffs have proven that the present Medicaid reimbursement scheme overseen by Defendant AHCA fails to adequately compensate Plaintiffs for medically necessary outpatient psychiatric services to adolescents, such that the

reimbursement rate is not "reasonable and adequate to meet the costs ... of efficiently and economically operated facilities," in violation of the Boren Amendment to Title XIX of the Social Security Act, 42 U.S.C. § 1396a(a)(13)(A), and 42 U.S.C. § 1983.

2. Based upon the foregoing, Plaintiffs are entitled to a declaratory judgment holding the State of Florida's Medicaid reimbursement system to be deficient in that (i) it fails to pay for the "grace days" spent by adolescent psychiatric care patients at the Plaintiff hospitals' facilities under the circumstances described herein, and (ii) the effect of AHCA's refusal to reimburse the hospitals at a rate reflective of the medically necessary level of care received by these patients during the "grace days" is to give Plaintiffs an outpatient per diem rate of zero for the medically necessary outpatient services provided in an in-patient setting, such that the outpatient rate is unreasonable and inadequate to meet the costs of an economically and efficiently run facility.  Both deficiencies constitute violations of the Boren Amendment, and the Court so holds.

3. Defendant AHCA is enjoined from future violations of the Boren Amendment, as set forth herein.  AHCA shall adopt for each Plaintiff hospital an interim outpatient reimbursement rate that is reasonable and adequate to meet the costs of an economically and efficient run facility.  AHCA shall reimburse Plaintiffs in accordance with the existing in-patient rate, or the interim outpatient rate, as dictated by the medical necessity of each individual case.  This injunction is to remain in full force and effect until further order of the Court.

4. Defendant AHCA, through the Florida Legislature, is directed to amend Florida's Medicaid plan in such a way as to be non-violative of the Boren Amendment—namely, Florida's Medicaid plan must be amended to include reimbursement for inappropriate level of care services.

5. The Court retains jurisdiction for a period of 60 days for the purposes of assessing attorney fees and costs.

6. Any application for attorney fees must be filed by Plaintiffs by February 30, 1996.

7. The clerk is directed to enter judgment for Plaintiffs and close this case, subject to the retained jurisdiction for the limited purposes herein specified.

DONE AND ORDERED this 18th day of January, 1996.