[PUBLISH]

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE ELEVENTH CIRCUIT**
_____

No. 96-5144
_____

D.C. Docket No. 92-589-CIV-FERGUSON


JOHN/JANE DOE, 1-13 by and through Mr./Mrs.
Doe Sr. No.'s 1-13 as natural guardians on behalf
of John/Jane Doe 1-13 and on behalf of those
similarly situated, FLORIDA ASSOCIATION OF
REHABILITATION FACILITIES INCORPORATED,
a Not-for-Profit association, UNITED CEREBRAL PALSY
OF FLORIDA, INCORPORATED, a Florida Not-for-Profit
Corporation,

                                        Plaintiffs-Appellees,


        versus


LAWTON CHILES, in his official capacity as Governor
of the State of Florida, ROBERT WILLIAMS, individually
and in his official capacity as Secretary of the Department
of Health & Rehabilitative Services of the State of Florida,
GARY CLARKE, individually and in his official capacity
as Assistant Secretary for Medicaid, Department of Health
& Rehabilitative Services of the State of Florida, CHARLES
KIMBER, in his official capacity as Assistant Secretary for
Developmental Services of the Department of Health &
Rehabilitative Services, State of Florida, SECRETARY OF
THE DEPARTMENT OF HEALTH AND REHABILITATIVE
SERVICES, Edward A. Feaver, in his official capacity,

                                        Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(February 26, 1998)**

Before HATCHETT, Chief Judge, BARKETT, Circuit Judge, and PROPST[*], Senior
District Judge.


HATCHETT, Chief Judge:


In this action based on 42 U.S.C. § 1983, the district court found that officials of

the Florida Department of Health and Rehabilitative Services were failing to furnish

Medicaid assistance with "reasonable promptness" to eligible developmentally disabled

individuals, and thus were violating a provision of the Medicaid Act, 42 U.S.C. §

_____

[*] Honorable Robert B. Propst, Senior U.S. District Judge for the Northern District of
Alabama, sitting by designation.

1396a(a)(8).[1]  Thereafter, the court enjoined the officials from failing to provide the

assistance within a "reasonable" time period, not to exceed ninety days.  The officials

appeal, and, for the reasons stated herein, we affirm the judgment of the district court.

## I.  BACKGROUND

In March 1992, the plaintiffs-appellees -- Medicaid-eligible, developmentally

disabled (i.e., mentally retarded) individuals who had been placed on waiting lists for

entry into intermediate care facilities for the developmentally disabled ("ICF/DD" or

"ICF/MR") -- instituted this lawsuit pursuant to section 1983, claiming that the

defendants-appellants were causing unreasonable delays regarding the provision of

ICF/DD services in violation of section 1396a(a)(8) and the Fifth and Fourteenth

Amendments to the United States Constitution.  The appellees' class-action complaint

alleged that they were not "receiving the therapies, training and other active treatment to

which they are entitled by virtue of [their] eligibility for a residential placement in an

[ICF]."  The complaint further averred that most of the appellees had been waiting for

"over five years" for Medicaid services and were "languish[ing] without the training and

therapies they so desperately need."[2]  The appellants do not contest that serious delays

_____

[1] In 1996, the Florida Legislature redesignated the Department of Health and
Rehabilitative Services as the Department of Children and Family Services and
established a separate Department of Health.  See Fla. Stat. Ann. § 20.19, .43 (West Supp.
1998).

[2] Under the ICF/DD program:

Each client must receive a continuous active treatment program, which

3

have occurred. In fact, in their initial brief to this court, they acknowledge that their practices "resulted in waiting periods of several years."[3] The appellees sought injunctive, declaratory and incidental monetary relief.

Amidst extended pre-trial proceedings, the appellees moved for class certification, and both sides moved for summary judgment.[4] On July 22, 1996, the district court granted the appellees summary judgment, holding:

> Section 1396a(a)(8) of the Medicaid [A]ct, specifically the reasonable promptness clause, is enforceable under 42 U.S.C. § 1983. "Medical assistance under the plan" has been defined as medical services. The [S]tate is obliged to furnish medical services, however, only to the extent that such placements are offered in the Federal Health Care Financing Agency ("HCFA") approved State plan. Once a state elects to provide a service, that service becomes part of the state Medicaid plan and is subject to the requirements of Federal law.

---

> includes aggressive, consistent implementation of a program of specialized and generic training, treatment, health services and related services . . . , that is directed toward--
> (i) The acquisition of the behaviors necessary for the client to function with as much self determination and independence as possible; and
> (ii) The prevention or deceleration of regression or loss of current optimal functional status.

42 C.F.R. § 483.440(a)(1)(i)-(ii) (1996). The ICF/DD program is restricted to individuals with sufficiently severe mental retardation and related conditions. It is not designed for "generally independent clients who are able to function with little supervision or in the absence of a continuous active treatment program." 42 C.F.R. § 483.440(a)(2) (1996).

[3] See also Appellants' Reply Br. at 2 (appellants "did not dispute the occurrence and length of delays").

[4] In December 1992, the district court dismissed defendant Lawton Chiles, the Governor of Florida, and the organizational plaintiffs, the Florida Association of Rehabilitation Facilities, Inc. and United Cerebral Palsy of Florida, Inc., from this lawsuit.

At oral argument on this issue, Defendants conceded that Florida's [HCFA] State approved plan does provide for placement in ICF/MR facilities. Further, Defendants have not disputed the facts alleging the [S]tate's failure to conform with the provisions set forth in that statute, which the Court construes as an admission of unreasonable delays in placing developmentally disabled persons into ICF/MR facilities.

(Citations and footnote omitted.)[5]

On August 26, 1996, a magistrate judge signed a report recommending that the district court grant the appellees' motion to certify as a class "all those developmentally disabled persons who have not received prompt [ICF/DD] placement." After conducting a hearing on August 28, 1996, the district court entered final judgment that day, ordering that the appellants "shall, within 60 days of the date of this Order, establish within the State's Medicaid Plan a reasonable waiting list time period, not to exceed ninety days, for individuals who are eligible for placement in ICF/DD."

On September 3, 1996, the appellants filed their notice of appeal.[6] On January 6, 1997, the district court denied the appellants' emergency motion to stay the final judgment pending appeal. On January 29, 1997, this court ordered an expedited briefing schedule; denied the appellants' emergency motion for a stay pending appeal as to the named appellees; and granted the appellants' emergency motion for a stay pending appeal as to relief for putative class members.

---

[5] The court did not reach the appellees' constitutional claims.

[6] Subsequent to the filing of the notice of appeal, the district court denied the monetary claims the appellees had pressed against appellants Robert Williams and Gary Clarke.

## II. CONTENTIONS

The appellants challenge the district court's determination as to liability on four grounds. According to the appellants: (1) the appellees lack standing to bring this lawsuit; (2) recipients of Medicaid services cannot assert a cause of action under section 1396a(a)(8); (3) section 1396a(a)(8) does not give rise to a federal right enforceable under section 1983; and (4) the Eleventh Amendment bars this action. The appellants also contend that the district court abused its discretion in rendering the injunctive relief it imposed.

We find the appellants' standing argument meritless and unworthy of further discourse.[7] Accordingly, part A of the discussion section below addresses the appellants'

---

[7] The crux of the appellants' standing claim is that the appellees have not demonstrated any injury resulting from the appellants' failure to provide Medicaid services in a timely manner. The district court described this argument as "frivolous," and the appellants' counsel only raised it in passing during oral argument before this court. We agree with the district court that the record reveals "a plethora of facts showing the harm caused to developmentally disabled persons by the State of Florida's current procedure which allows eligible Medicaid recipients who have been determined to be in need of ICF/DD services to be placed on indefinite waiting lists."

The plight of appellee Jane Doe 6 is illustrative. Jane is approximately thirty-nine years of age and lives at home with her parents, who are in their mid-to-late seventies and have significant health problems. Jane is severely retarded and has Downs Syndrome. She can walk but, for the most part, cannot talk, and she is totally dependent upon others for all of her daily life activities. Jane has been waiting for about ten years for ICF/DD services. The uncontroverted evidence reveals that Jane's failure to receive these services in anything approaching a timely fashion has caused her to lose several skills and fail to develop others. As to the future, Kathy Whitaker, a qualified mental retardation professional who evaluated Jane, concluded as follows:

Future vision of Jane without training indicates a continued lessening of

6

statutory arguments as to liability; part B assesses the appellants' Eleventh Amendment claim; and part C addresses the appellants' contentions regarding the injunctive relief the district court rendered.

## III.  STANDARDS OF REVIEW

We review a district court's conclusions of law de novo.  DeKalb County Sch. Dist. v. Schrenko, 109 F.3d 680, 687 (11th Cir.) (per curiam), cert. denied, 118 S. Ct. 601 (1997).  "We review the district court's grant of injunctive relief for abuse of discretion, meaning we must affirm unless we at least determine that the district court has made a clear error of judgment or has applied an incorrect legal standard."  SunAmerica Corp. v. Sun Life Assurance Co. of Can., 77 F.3d 1325, 1333 (11th Cir.) (internal quotation marks and citations omitted), cert. denied, 117 S. Ct. 79 (1996).

## IV.  DISCUSSION

### A.

Section 1983 imposes liability on anyone who, acting under color of state law, deprives a person of "any rights, privileges, or immunities secured by the Constitution

---

skills, a lack of motivation, escalated isolation with no opportunities for peer development and contact, and daily lack of meaningful activities to reduce the ineffectual time spent simply listening to the radio, music and doing child-like puzzles.  Jane is a person with many, many strengths that will dissolve and are dissolving each day as she is denied [services].

Whitaker's conclusion went uncontradicted in the district court.  "[A] party has standing to seek injunctive relief . . . if the party alleges, and ultimately proves, a real and immediate . . . threat of future injury."  Church v. City of Huntsville, 30 F.3d 1332, 1337 (11th Cir. 1994).

and laws." 42 U.S.C.A. § 1983 (West Supp. 1997). In Maine v. Thiboutot, 448 U.S. 1, 4-8 (1980), the Supreme Court held that section 1983 can be used to vindicate violations of federal statutory rights. See also Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 105 (1989) ("As the language of the statute plainly indicates, the remedy encompasses violations of federal statutory as well as constitutional rights."). As the Court recently made clear in Blessing v. Freestone, 117 S. Ct. 1353, 1359 (1997):

> In order to seek redress through § 1983, however, a plaintiff must assert the violation of a federal right, not merely a violation of federal law. We have traditionally looked at three factors when determining whether a particular statutory provision gives rise to a federal right. First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory rather than precatory terms.

(Citations omitted.) See also Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 509 (1990) ("Such an inquiry turns on whether the provision in question was intended to benefit the putative plaintiff. If so, the provision creates an enforceable right unless it reflects merely a congressional preference for a certain kind of conduct rather than a binding obligation on the governmental unit, or unless the interest the plaintiff asserts is too vague and amorphous such that it is beyond the competence of the judiciary to enforce.") (internal quotation marks, citations and brackets omitted); Harris v. James, 127 F.3d 993, 999 & n.7 (11th Cir. 1997); Maynard v. Williams, 72 F.3d 848, 852 (11th Cir. 1996). If a

8

statutory provision meets these three factors, a rebuttable presumption "that the right is enforceable under § 1983" arises.  Blessing, 117 S. Ct. at 1360.[8]

"Medicaid is a cooperative federal-state program through which the Federal Government provides financial assistance to States so that they may furnish medical care to needy individuals."  Wilder, 496 U.S. at 502.[9]  Federal law does not require Florida to provide ICF/DD services in order to participate in the Medicaid program.  See 42 U.S.C.A. § 1396a(a)(10)(C)(iv), § 1396a(a)(31) (West Supp. 1997); King by King v. Sullivan, 776 F. Supp. 645, 651 (D.R.I. 1991) ("A participating state has the option not to offer ICF-MR services at all.").  Florida, however, has elected to do so.  See Fla. Stat.

_____

[8] For a detailed discussion of the Supreme Court's case law in this area, see Harris, 127 F.3d at 997-1004.  The Harris majority, however, failed to mention Livadas v. Bradshaw, 512 U.S. 107 (1994).  In that case, Justice Souter wrote the following for a unanimous Court:

> We have, it is true, recognized that even the broad statutory text [of section 1983] does not authorize a suit for every alleged violation of federal law.  A particular statutory provision, for example, may be so manifestly precatory that it could not fairly be read to impose a "binding obligation" on a governmental unit, or its terms may be so "vague and amorphous" that determining whether a "deprivation" might have occurred would strain judicial competence.  And Congress itself might make it clear that violation of a statute will not give rise to liability under § 1983, either by express words or by providing a comprehensive alternative enforcement scheme.  But apart from these exceptional cases, § 1983 remains a generally and presumptively available remedy for claimed violations of federal law.

Livadas, 512 U.S. at 132-33 (citations and brackets omitted).

[9] Title XIX of the Social Security Act, commonly known as the Medicaid Act, is codified at 42 U.S.C. §§ 1396-1396v.

9

Ann. § 409.904(3) (West Supp. 1998). "[W]hen a state elects to provide an optional service, that service becomes part of the state Medicaid plan and is subject to the requirements of federal law." Tallahassee Mem'l Reg'l Med. Ctr. v. Cook, 109 F.3d 693, 698 (11th Cir. 1997) (per curiam); see also McMillan v. McCrimon, 807 F. Supp. 475, 481-82 (C.D. Ill. 1992) ("The fact that the [Home Services Program] is an optional service does not exempt it from the requirements of section 1396a(a)(8)."). It is undisputed that the federal government shoulders about fifty-five percent of the costs that Florida incurs in providing ICF/DD services.

Section 1396a(a)(8) reads: "A State plan for medical assistance must . . . provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." 42 U.S.C.A. § 1396a(a)(8) (West Supp. 1997) (emphasis added). A corresponding regulation provides that the responsible state agency "must," among other things, "[f]urnish Medicaid promptly to recipients without any delay caused by the agency's administrative procedures," and "[c]ontinue to furnish Medicaid regularly to all eligible individuals until they are found to be ineligible." 42 C.F.R. § 435.930(a)-(b) (1996). Another regulation states that "[t]he agency must establish time standards for determining eligibility and inform the applicant of what they are." 42 C.F.R. § 435.911(a) (1996). These periods are not to exceed "[n]inety days for applicants who apply for Medicaid on the basis of disability" or "[f]orty-five days for all other applicants." 42 C.F.R. § 435.911(a)(1)-(2) (1996). Moreover, the agency "must not

10

use the time standards" as "a waiting period." 42 C.F.R. § 435.911(e)(1) (1996). It is this panel's task to determine whether the "reasonable promptness" clause of section 1396a(a)(8) "gives rise to a federal right."[10]

Preliminarily, we note that this court's recent decision in Harris v. James did not address the issue at bar. In Harris, the court decided the "narrow issue" of "whether Medicaid recipients have a federal right to transportation which may be enforced in an action under § 1983." 127 F.3d at 996. The right to transportation that the Harris plaintiffs sought to enforce appeared "explicitly not in the Medicaid Act, but in a federal regulation," 42 C.F.R. § 431.53. 127 F.3d at 1005. The Harris majority first rejected the notion of "finding enforceable rights in any valid administrative interpretation of a statute that creates some enforceable right." 127 F.3d at 1008. The court then concluded that the transportation regulation did "not define the content of any specific right conferred upon the plaintiffs by Congress," and thus its nexus to "Congressional intent to create federal rights" was "too tenuous to create an enforceable right." 127 F.3d at 1010. The court held that the plaintiffs had no enforceable rights pursuant to Medicaid Act sections 1396a(a)(1), 1396a(a)(4)(A), or 1396a(a)(19). 127 F.3d at 1010-11. In addition, the court found "no right [to transportation] under the regulation read in conjunction with" sections 1396a(a)(8), 1396a(a)(10)(B), or 1396a(a)(23). 127 F.3d at 1011. In so doing,

---

[10] Clearly, the appellees have "identif[ied] with particularity the right[] they claim[]." Blessing, 117 S. Ct. at 1360.

11

however, the majority made clear that it was not deciding the issue of whether section

1396a(a)(8) gives rise to a federal right to reasonably prompt provision of assistance:

> It may be that each of these statutes creates some federal right;[27] similarly, it may be that the transportation regulation is a valid interpretation of each of these provisions under Chevron[, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)]. However, we do not think these two factors, even if we found both to be true, would add up to a federal right to transportation. In each case the transportation regulation would be valid not because it reasonably defines the content of rights created by the statutory provisions, as did the regulation in Wright[ v. City of Roanoke Redevelopment & Housing Authority, 479 U.S. 418 (1987)], but only because the regulation furthers the broad objectives underlying each statutory provision. In other words, we do not think that transportation to and from providers is reasonably understood to be part of the content of a right to prompt provision of assistance, comparable assistance, or choice among providers. Instead, if the regulation is a valid interpretation of these provisions, it would be because transportation may be a reasonable means of ensuring the prompt provision of assistance, comparable assistance, or choice among providers. Such links to Congressional intent may be sufficient to support the validity of a regulation; however, we think they are too tenuous to support a conclusion that Congress has unambiguously conferred upon Medicaid recipients a federal right to transportation enforceable under section 1983.

127 F.3d at 1011-12.[11]  In short, the majority opinion in Harris does not dictate a

particular outcome on the issue before this panel.[12]

As stated above, the first factor for us to address is whether Congress has

"intended that the provision in question benefit the plaintiff."  Blessing, 117 S. Ct. at

---

[11] In footnote 27, the majority stated that it "assume[d] for the sake of argument only that these provisions create some federal right."  127 F.3d at 1011 n.27.

[12] Judge Kravitch dissented from the reasoning and result of the majority opinion in Harris.  See 127 F.3d at 1012-21 (Kravitch, J., dissenting).

1359. Again, section 1369a(a)(8) provides that "[a] State plan for medical assistance must . . . provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." 42 U.S.C.A. § 1396a(a)(8) (West Supp. 1997) (emphasis added). The plain language of the provision's reasonable promptness clause is clearly intended to benefit Medicaid-"eligible individuals" -- such as the appellees in this case.[13] Therefore, we do not hesitate in concluding that the clause meets the first factor. See Sobky, 855 F. Supp. at 1146 ("Because § 1396a(a)(8) establishes requirements for providing services and is phrased in terms of benefitting individuals seeking Medicaid services, Medi-Cal recipients are the intended beneficiaries.") (internal quotation marks omitted); Blanchard v. Forrest, Civ. A. No. 93-3780, slip op. at 13 (E.D. La. Sept. 6, 1994) (reasonable promptness clause of section 1396a(a)(8) "certainly provide[s] a benefit to plaintiffs"); cf. Wilder, 496 U.S. at 510 ("There can be little doubt that health care providers are the intended beneficiaries of the

_____

[13] We reject the appellants' contention that "providers of services" are the intended beneficiaries of the reasonable promptness clause. See, e.g., Sobky v. Smoley, 855 F. Supp. 1123, 1147 (E.D. Cal. 1994) ("§ 1396a(a)(8) requires 'medical assistance under the plan' to be furnished with reasonable promptness, and this can only mean medical services."); McMillan, 807 F. Supp. at 480 ("[C]ourts have interpreted the second clause in section 1396a(a)(8) -- 'such assistance shall be furnished with reasonable promptness to all eligible individuals' -- as applying to benefits beyond the initial application for Medicaid."); King by King, 776 F. Supp. at 651 ("Placement in the Ladd Center [a public ICF/MR] undoubtedly is 'medical assistance under the plan.'"); see also Silver v. Baggiano, 804 F.2d 1211, 1216 (11th Cir. 1986) ("As with the Medicaid statute as a whole, [the "freedom of choice" provision of] § 1396a(a)(23) was intended to benefit Medicaid recipients.") (footnote omitted).

13

Boren Amendment [to the Medicaid Act]. The provision [section 1396a(a)(13)(A)] establishes a system for reimbursement of providers and is phrased in terms of benefiting health care providers . . . ."); Golden State Transit, 493 U.S. at 112; Wright, 479 U.S. at 430 ("The Brooke Amendment [to the Housing Act of 1937] could not be clearer: as further amended in 1981, tenants could be charged as rent no more and no less than 30 percent of their income. . . . The intent to benefit tenants is undeniable."); Maynard, 72 F.3d at 852-53.

Next, we inquire whether the appellees have "demonstrate[d] that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence." Blessing, 117 S. Ct. at 1359. In other words, in the context of this case, we ask whether enforcing putative Medicaid recipients' right to reasonably prompt medical assistance exceeds our institutional competence. We think not.

We find support for our conclusion in the Supreme Court's decisions in Wright and Wilder. In Wright, residents of low-income housing projects alleged that their local public housing authority ("PHA") had overbilled them for their utilities, and thus had violated the Brooke Amendment -- which mandated that a low-income family "'shall pay as rent' a specified percentage of its income" -- and implementing regulations that required that "rent" include a "reasonable" amount for the use of utilities. 479 U.S. at 420. The Court rejected the PHA's assertion that "the provision for a 'reasonable' allowance for utilities is too vague and amorphous to confer on tenants an enforceable

14

'right' within the meaning of § 1983." Wright, 479 U.S. at 431.  Relying primarily on the legality and specificity of the regulations "defining the statutory concept of 'rent' as including utilities," the Court concluded that "the benefits Congress intended to confer on tenants are sufficiently specific and definite to qualify as enforceable rights . . . , rights that are not, as respondent suggests, beyond the competence of the judiciary to enforce." Wright, 479 U.S. at 431-32.

In Wilder, the question presented was "whether the Boren Amendment to the [Medicaid] Act, which requires reimbursement according to rates that a 'State finds . . . are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities,' is enforceable in an action pursuant to § 1983."  496 U.S. at 501-02 (quoting 42 U.S.C. § 1396a(a)(13)(A)) (citation omitted).  The Court answered that inquiry in the affirmative and, in so doing, rejected the argument that the amendment was "too 'vague and amorphous' to be judicially enforceable."  Wilder, 496 U.S. at 519.  In support of its position, the Court observed that the statute and regulation at issue set out factors which the states had to consider in adopting rates.  Wilder, 496 U.S. at 519.[14]  The Court also stated:

> That the amendment gives the States substantial discretion in choosing
> among reasonable methods of calculating rates may affect the standard
> under which a court reviews whether the rates comply with the amendment,
> but it does not render the amendment unenforceable by a court.  While there

---

[14] The Court noted that the Boren Amendment provided "more guidance than the provision at issue in Wright, which vested in the housing authority substantial discretion for setting utility allowances."  Wilder, 496 U.S. at 519 n.17.

15

may be a range of reasonable rates, there certainly are <u>some</u> rates outside that range that no State could ever find to be reasonable and adequate under the Act. Although some knowledge of the hospital industry might be required to evaluate a State's findings with respect to the reasonableness of its rates, such an inquiry is well within the competence of the Judiciary.

<u>Wilder</u>, 496 U.S. at 519-20 (footnote omitted).[15]

Like the statutory provisions at issue in <u>Wright</u> and <u>Wilder</u>, section 1396a(a)(8)'s requirement that "assistance shall be furnished with <u>reasonable promptness</u> to all eligible individuals" presents a sufficiently specific and definite standard readily susceptible to judicial assessment. In our view, evaluating the reasonable promptness of the provision of Medicaid assistance is less onerous than evaluating whether a state's Medicaid reimbursement rates are "reasonable and adequate." Moreover, as <u>Wright</u> and <u>Wilder</u> indicate, the fact that a state retains substantial discretion in determining the relevant time periods "does not render the [clause] unenforceable by a court." <u>Wilder</u>, 496 U.S. at 519. "While there may be a range of reasonable [time periods for provision of assistance], there certainly are <u>some</u> [time periods] outside that range that no State could ever find to be reasonable . . . under the [Medicaid] Act." <u>Wilder</u>, 496 U.S. at 519-20. Indeed, given the egregious facts of this case it is difficult for the appellants to argue that the appellees do not meet the second factor. We agree with the appellees' assertion that in this context, "[i]t is axiomatic that delays of 'several years' . . . are far outside the realm of reasonableness."

---

[15] The continuing viability of <u>Wright</u> and <u>Wilder</u> is not in doubt. <u>See</u> <u>Harris</u>, 127 F.3d at 1004 (<u>Wright</u> and <u>Wilder</u> "remain good law").

16

We also find that the regulations further define the contours of the statutory right to reasonably prompt provision of assistance. See Harris 127 F.3d at 1008-09 ("Wright would seem to indicate that so long as the statute itself confers a specific right upon the plaintiff, and a valid regulation merely further defines or fleshes out the content of that right, then the statute -- 'in conjunction with the regulation' -- may create a federal right as further defined by the regulation."). As stated above, regulation section 435.930 requires that a state "must" "[f]urnish Medicaid promptly to recipients without any delay caused by the agency's administrative procedures," and "[c]ontinue to furnish Medicaid regularly to all eligible individuals until they are found to be ineligible." 42 C.F.R. § 435.930(a)-(b) (1996). As also noted, 42 C.F.R. § 453.911(a) sets forth the acceptable time limits for eligibility determinations -- ninety days for disability-based applications and forty-five days for all others. In our view, section 1396a(a)(8) -- as further fleshed out by these regulations -- creates a federal right to reasonably prompt assistance, that is, assistance provided without unreasonable delay.

Suter v. Artist M., 503 U.S. 347 (1992), does not compel a contrary conclusion. In that case, the plaintiffs claimed a statutory right pursuant to a section of the Adoption Assistance and Child Welfare Act of 1980 ("AACWA"), requiring that "'[i]n order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary [of Health and Human Services] which . . . provides that, in each case, reasonable efforts will be made . . . prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and . . . to make it

17

possible for the child to return to his home . . . .'" Suter, 503 U.S. at 351 (quoting 42 U.S.C. § 671(a)(15)). The plaintiffs in Suter alleged that the responsible state agencies failed to make such "reasonable efforts." 503 U.S. at 352. The Court held that the plaintiffs did not possess a statutory right under section 671(a)(15). 503 U.S. at 350. Although the Court did not explicitly discuss the capable-of-judicial-enforcement factor, its holding relied in part on the fact that the "reasonable efforts" directive was one "whose meaning will obviously vary with the circumstances of each individual case." 503 U.S. at 360.

Indeed, the procedural history of Suter reveals that enforcing the "reasonable efforts" provision of the AACWA would strain judicial competence. In that case, in March 1990, the district court entered an order enjoining the Illinois Department of Children and Family Services ("DCFS") from failing to assign a caseworker to each child placed in DCFS custody within three working days of the time the child's case was first heard in juvenile court, and from failing to reassign a caseworker within three working days of the date any caseworker relinquished responsibility for a particular case. Suter, 503 U.S. at 354. In April 1990, the district court established a weekly reporting mechanism for compliance with the March 1990 injunction. The April order required that every Friday the DCFS would provide to plaintiffs' counsel a list of all children "whose cases have just entered Juvenile Court or who have recently lost their caseworker, along with the names of involved caseworkers and relevant dates of commencement or completion of assignments." Artist M. v. Johnson, 917 F.2d 980, 984 n.6 (7th Cir. 1990),

18

rev'd sub nom., Suter v. Artist M., 503 U.S. 347 (1992).  On appeal, the Seventh Circuit

remanded for the district court to make factual findings regarding the nature of delays in

caseworker assignments and the progress of DCFS reforms as they existed at the time the

trial court rendered the injunction in March 1990.  Artist M., 917 F.2d at 984.  In order to

render findings on these issues, the district court had to review "the February 1990 logs of

the DCFS regarding caseworker assignment" and "closely scrutinize[]" "the January and

February activities of the DCFS."  Artist M., 917 F.2d at 984 (emphasis added).

Federal courts are simply not well-equipped for such undertakings.  It is quite

evident, however, that "[w]hat constitutes 'reasonable' promptness in providing medical

assistance is inherently more circumscribed and judicially ascertainable than the concept

of 'reasonable efforts' in the placement of foster children . . . ."  Sobky, 855 F. Supp. at

1147.[16]  We conclude that the appellees have shown that their right to reasonably prompt

provision of assistance under section 1396a(a)(8) is not so vague and amorphous that its

enforcement would strain judicial competence.  See Sobky, 855 F. Supp. at 1147 (same);

Wellington v. District of Columbia, 851 F. Supp. 1, 5-6 (D.D.C. 1994) (same); Blanchard,

slip op. at 14-16 (same); see also Kessler v. Blum, 591 F. Supp. 1013, 1032 (S.D.N.Y.

1984) (quoting with approval the proposition that "[i]n the absence of an express time for

_____

[16] We also note that the Suter Court found it "significant" that the AACWA's
regulations were "not specific."  503 U.S. at 362.  As discussed, this is not the case with
the relevant Medicaid regulations, which, in requiring states to provide medical assistance
without any delay attributable to administrative processes and in establishing concrete
time limits on processing Medicaid applications, flesh out the meaning of section
1396a(a)(8)'s reasonable promptness mandate.

19

compliance, courts are uniquely suited to determining what is reasonable") (internal quotation marks omitted).

The third factor we address is whether the reasonable promptness clause "unambiguously impose[s] a binding obligation on the States." Blessing, 117 S. Ct. at 1359. The language of the statute is undoubtedly cast in mandatory rather than precatory terms. See 42 U.S.C.A. § 1396a(a)(8) (West Supp. 1997) ("A State plan for medical assistance must . . . provide that all individuals wishing to make application for medical assistance under the plan shall have the opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals.") (emphasis added). In addition, a state's receipt of federal Medicaid funds is expressly conditioned on its compliance with the provisions of section 1396a. See 42 U.S.C.A. § 1396c (West 1992). Accordingly, under the dictates of Wilder, 496 U.S. at 512, we hold that the reasonable promptness clause meets the third factor.[17]

Because they have passed the three-factor test, the appellees are entitled to a rebuttable presumption that their statutory right is enforceable under section 1983.

_____

[17] Relying on section 671(a)'s preliminary language that "[i]n order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary," the Suter court held that the AACWA did not require states to make reasonable efforts to keep families together, but only that they have Secretary-approved plans pronouncing that such reasonable efforts will be made. See Suter, 503 U.S. at 358. Section 1396a(a), however, does not contain such limiting language. "The right [under section 1396a(a)(8)] is not merely a procedural one that [the plan provide that medical assistance be furnished with reasonable promptness]; rather, the Act provides a substantive right to [reasonably prompt provision of assistance] as well." Wilder, 496 U.S. at 510.

Blessing, 117 S. Ct. at 1360. However, "dismissal is proper if Congress specifically foreclosed a remedy under § 1983." Blessing, 117 S. Ct. at 1360 (internal quotation marks omitted). "Congress may do so expressly, by forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." Blessing, 117 S. Ct. at 1360. The Supreme Court has repeatedly stressed that the burden of making this showing rests with the defendant. See, e.g., Blessing, 117 S. Ct. at 1362; Wilder, 496 U.S. at 520-21; Golden State Transit, 493 U.S. at 107; Wright, 479 U.S. at 423. Wisely, the appellants have made no such argument in this court. See Wilder, 496 U.S. at 520 (finding "little merit" to the argument that "Congress has foreclosed enforcement of the Medicaid Act under § 1983").

In sum, we hold that the appellees have a federal right to reasonably prompt provision of assistance under section 1396a(a)(8) of the Medicaid Act, and that this right is enforceable under section 1983.[18]

---

[18] Accord Sobky, 855 F. Supp. at 1146-47; Wellington, 851 F. Supp. at 5-6; Blanchard, slip op. at 13-17. We also note that in her dissenting opinion in Harris, Judge Kravitch expressed the view that section 1396a(a)(8),

> standing alone, creates an enforceable right to medical assistance. It plainly satisfies the first two prongs of the Wilder test because it is intended to benefit the plaintiffs and is mandatory on the States. Furthermore, even though the term "reasonable promptness" is arguably vague, § 1396a(a)(8) is specific and definite in its command that "all eligible individuals" be furnished "medical assistance." Because § 1396a(a)(8) would be judicially enforceable against a State that refused to provide medical assistance to eligible individuals, the statutory provision plainly satisfies the third prong

21

**B.**

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Supreme Court has not limited its application of sovereign immunity to the suits described in the text of the Eleventh Amendment. "To respect the broader concept of immunity, implicit in the Constitution, which we have regarded the Eleventh Amendment as evidencing and exemplifying, we have extended a State's protection from suit to suits brought by the State's own citizens." Idaho v. Coeur d'Alene Tribe of Idaho, 117 S. Ct. 2028, 2033 (1997) (citing Hans v. Louisiana, 134 U.S. 1 (1890)). Consequently, "the Eleventh Amendment constitutes an absolute bar to a state's being sued by its own citizens, among others." DeKalb County Sch. Dist. v. Schrenko, 109 F.3d 680, 687 (11th Cir.) (per curiam) (internal quotation marks omitted), cert. denied, 118 S. Ct. 601 (1997).

To support the district court's grant of injunctive relief in this case, the appellees rely on the Ex parte Young, 209 U.S. 123 (1908), doctrine, which "permits federal courts to enjoin state officials to conform their conduct to the requirements of federal law, even if there is an ancillary impact on the state treasury." Schrenko, 109 F.3d at 690 (citing

---

of the Wilder test. Thus, standing alone, § 1396a(a)(8) confers upon the plaintiffs an enforceable right to medical assistance.

127 F.3d at 1018 (Kravitch, J., dissenting) (footnotes omitted).

Milliken v. Bradley, 433 U.S. 267, 289 (1977)).  As the Court has recently reinforced, a plaintiff's claim seeking prospective injunctive relief against a state officer's ongoing violation of federal law can ordinarily proceed in federal court.  Coeur d'Alene Tribe of Idaho, 117 S. Ct. at 2040; see also Seminole Tribe of Fla. v. Florida, 116 S. Ct. 1114, 1131 nn.14 & 16 (1996).[19]

This court's recent decision in Tallahassee Memorial Regional Medical Center v. Cook, 109 F.3d 693 (11th Cir. 1997) (per curiam), controls this issue.  In Cook, two hospitals that provide in-patient psychiatric care under Florida's Medicaid program brought suit against the Director of the Florida Agency for Health Care Administration ("AHCA"), seeking injunctive and declaratory relief under section 1983 and the Boren Amendment, 42 U.S.C. § 1396(a)(13)(A).  109 F.3d at 695-96.[20]  The factual background in Cook was as follows:

> [D]ue to organizational or funding deficiencies in the state's medical assistance program, there is an extreme shortage of available spaces at alternative care facilities for . . . adolescent psychiatric patients.
>
> . . . .

[19] "The [Ex parte Young] doctrine is not, however, without limitations.  A federal court cannot award retrospective relief, designed to remedy past violations of federal law."  Coeur d'Alene Tribe of Idaho, 117 S. Ct. at 2043 (O'Connor, J., with Scalia and Thomas, JJ., concurring in part and concurring in judgment).

[20] With certain exceptions that will be discussed, the Cook panel affirmed "on the basis of the well-reasoned district court order," and attached that order as Appendix A to its opinion.  109 F.3d at 694.

Plaintiffs have therefore repeatedly found themselves forced into the posture of retaining and caring for adolescent psychiatric patients after the medical necessity for in-patient, acute care services ceases, because treatment at an alternative facility was medically necessary for the patient, but placement in such an alternative setting was impossible or greatly delayed. Under these circumstances, the Plaintiffs may not discharge the patients to the home, since they are not medically able to return to such an unsupervised setting. . . . Thus, the hospitals are forced, through no fault of their own, to retain these patients until placement in an alternative setting is possible.

On retrospective review, [Keystone Peer Review Organization, which is under contract to review the Medicaid claims at issue,] abides by Medicaid guidelines by denying Plaintiffs payment for in-patient psychiatric services for adolescents at the point those services are no longer medically necessary. However, Florida's failure to adopt a provision for payment of inappropriate level of care services causes AHCA to deny any reimbursement to the two hospitals for those "grace days," regardless of the duration the adolescent patient has to wait before an alternative out-patient setting is available. AHCA, through its denial of reimbursement to Plaintiffs for adolescent psychiatric patient "grace days," thereby shifts the deficiencies of the State's medical assistance program, and the resulting fiscal impact of the same, to the Plaintiff hospitals.

109 F.3d at 700-01 (footnote omitted). The district court held that the defendant's practices violated the Boren Amendment, and it rendered declaratory and injunctive decrees. 109 F.3d at 703-05. This court affirmed in full the trial court's holdings as to liability and declaratory relief. 109 F.3d at 694-95.

This court also affirmed the prospective injunctive relief entered against the defendant, AHCA:

Defendant AHCA is enjoined from future violations of the Boren Amendment, as set forth herein. AHCA shall adopt for each Plaintiff hospital an interim outpatient reimbursement rate that is reasonable and adequate to meet the costs of an economically and efficiently run facility. AHCA shall reimburse Plaintiffs in accordance with the existing in-patient

24

> rate, or the interim outpatient rate, as dictated by the medical necessity of each individual case. This injunction is to remain in full force and effect until further order of the Court.

109 F.3d at 694-95, 705 (brackets omitted). This holding confirms our belief that the instant lawsuit fits neatly within the Ex parte Young exception. Like the hospitals in Cook, the appellees in this case seek prospective injunctive relief to enjoin state officials from continuing to violate federal law, that is, the Medicaid Act.

The Cook panel, however, correctly vacated on Eleventh Amendment grounds the provisions of the district court's order that compelled the Florida Legislature to "amend its Medicaid plan to include reimbursement for medically necessary inappropriate level of care services." 109 F.3d at 695, 704. In the present case, the district court's Final Judgment reads: "Accordingly, it is ORDERED AND ADJUDGED that Defendants shall, within 60 days of the date of this Order, establish within the State's Medicaid Plan a reasonable waiting list time period, not to exceed ninety days, for individuals who are eligible for placement in ICF/DD institutional care facilities." This language only means that the appellants must incorporate into their present scheme of providing services procedures that ensure a waiting list period of not more than ninety days. Consequently, the Eleventh Amendment poses no bar to this lawsuit or to the injunctive relief the district court imposed against the appellants. See Cook, 109 F.3d at 694-95, 704-05.

**C.**

The appellants' final claim is that the district court abused its discretion in enjoining them to provide the Medicaid services at issue within ninety days. The appellants put forth several arguments in support of this position.

First, the appellants emphasize the optional nature of the ICF/DD program. As we have stated, however, "even when a state elects to provide an optional service, that service becomes part of the state Medicaid plan and is subject to the requirements of federal law." Cook, 109 F.3d at 698; see also Weaver v. Reagen, 886 F.2d 194, 197 (8th Cir. 1989) ("Once a state chooses to offer such optional services it is bound to act in compliance with the [Medicaid] Act and the applicable regulations in the implementation of those services . . . ."). Accordingly, appellants' assertion here does little to undermine our confidence regarding the propriety of the district court's injunction.

Second, the appellants assert that the district court's enjoinment prevents them from emphasizing the provision of community-based services to developmentally disabled individuals in place of institutional care. The appellants state that in recent years "Florida has emphasized the use of the home and community based waiver as its principal vehicle for expanding and improving long-term care services to individuals with developmental disabilities."[21] The appellants' belief that the district court's order will

_____

[21] The Social Security Act "permits States to offer, under a waiver of statutory requirements, an array of home and community-based services that an individual needs to avoid institutionalization." 42 C.F.R. § 441.300 (1996). See 42 U.S.C.A. § 1396n(c) (West Supp. 1997); see generally Medicaid Program; Home and Community-Based Services, 46 Fed. Reg. 48,532 (1981). In order to participate in this program, however, states must provide:

26

necessarily impede this trend is misplaced. The plain language of the district court's injunction does not prevent the appellants from continuing to pursue the home and community-based services waiver program in accordance with federal statutory and regulatory dictates, including section 1396a(a)(8).[22]

_____

> Assurance that when a recipient is determined to be likely to require the level of care provided in an . . . ICF/MR, the recipient or his or her legal representative will be--
> (1) Informed of any feasible alternatives available under the waiver; and
> (2) Given the choice of either institutional or home and community-based services.

42 C.F.R. § 441.302(d)(1)-(2) (1996).

We note that at a hearing before the district court on June 10, 1996, the appellants' counsel admitted that a waiting list also exists under the waiver program because "[t]here is not the money available to fund the program." Counsel did not mention the extent of the delays.

[22] This is not surprising given that the appellees' counsel repeatedly stressed that the appellants should retain complete discretion in determining how to provide ICF/DD services. At the June 10, 1996 hearing, for example, counsel stated that "[w]hat I have asked this Court to do is require of the defendants to comply with section [1396]a(a)(8) of the Medicaid statute and leave it to the defendants as to how they comply." At another hearing in October 1994, counsel told the magistrate judge:

> [T]he services that are needed by these people [the plaintiffs], according to the defendants and, in many cases, according to the plaintiffs, could be provided other than in a[n] [institutional] bed. They could be provided in the people's homes.
>
> There is something called the waiver program. . . . [O]ur position to the state has always been, if they want to provide everybody with services so that they don't need to be taken out of their current housing arrangement -- because they will get the physical therapy, the occupational therapy, the other on-call services that are needed, that's great. There won't be a lawsuit. They are always welcome to provide services to people in the

27

Third, the appellants devote three sentences in their initial brief to the contention that the ninety-day time limit is overly stringent. The appellants argue that the district court imposed this time limit without regard for the state's resources or its recent emphasis on providing community-based services as a substitute for institutionalization. We have already addressed the latter contention. As to the former, the appellants' bald statement does not convince us that the district court abused its discretion. In any event, "[i]nadequate state appropriations do not excuse noncompliance" with the Medicaid Act. Alabama Nursing Home Ass'n v. Harris, 617 F.2d 388, 396 (5th Cir. 1980); see also Cook, 109 F.3d at 704.

Fourth, the appellants argue that the injunction is overly broad. They contend, for example, that "[t]he final judgment was not limited to the inadequacy -- lengthy waiting time for placement in ICFs -- that produced the alleged injury." We could not disagree more. The injunction is crafted only toward generating a "reasonable waiting list time period" for eligible individuals. Thus, when the appellants further assert that "[t]he district court should have . . . ordered an[] end [to] lengthy waiting periods generally, without dictating how the problem was to be corrected," we find ourselves in complete accord. And, that is what the district court did. See Lewis v. Casey, 116 S. Ct. 2174,

---

manner in which they see fit.

We have filed a lawsuit based on the one federal right which exists, which is the right to [a prompt] ICF/MR placement if you're Medicaid eligible and meet the criteria. And if -- like anything else -- they want to entice people away by offering some other package of services, that's great.

28

2183 (1996) ("The remedy must of course be limited to the inadequacy that produced the injury-in-fact that the plaintiff has established.").[23]

Fifth, the appellants argue that the district court abused its discretion because it did not give Florida officials the option of "terminat[ing] [the] receipt of federal money rather than assum[ing] unanticipated burdens." The appellants' concern here is overstated, as a recipient of federal funds under Spending Clause legislation always retains this option.

> [I]n fashioning remedies for violations of Spending Clause statutes by recipients of federal funds, the courts must recognize that the recipient has alternative choices of assuming the additional costs of complying with what a court has announced is necessary to conform to federal law or of not using federal funds and withdrawing from the federal program entirely. Although a court may identify the violation and enjoin its continuance or order recipients of federal funds prospectively to perform their duties incident to the receipt of federal money, the recipient has the option of withdrawing and hence terminating the prospective force of the injunction.

---

[23] In addition, and unlike the circumstances in Casey, the appellees in this case have certainly established that the appellants' ongoing violation of federal law is "systemwide." See Casey, 116 S. Ct. at 2184 & n.7. Indeed, in the trial court the appellants did not contest the existence or length of the delays at issue. See, e.g., Defendants' Official Capacity Answer & Affirmative Defenses ("Answer") at ¶ 9(c) (admitting that Jane Doe 1 was "seeking a residential placement in an ICF/DD facility for 8 years"), ¶ 10(d) ("Admit that [John] Doe 2 has been on a waiting list for an ICF/DD placement for approximately five years . . . .") and ¶ 11(e) ("Defendants deny that [John] Doe 2b has been on a waiting list for ten years, but admit that he has been on a residential waiting list for eight years."). Nor did the appellants contest that the delays were pervasive. See, e.g., Answer at ¶ 6 (appellants "admit that there are large number[s] of individuals waiting for ICF/DD services"). Instead, they argued that the delays were permissible under the law. The record reveals that hundreds, perhaps even thousands, of eligible developmentally disabled persons are not being provided ICF/DD services with anything resembling reasonable promptness. Consequently, we reject the appellants' contention that "there was no showing of statewide or 'system' wide injury."

Guardians Ass'n v. Civil Serv. Comm'n of N.Y., 463 U.S. 582, 596 (1983) (opinion of White, J., with Rehnquist, J.) (internal quotation marks and citation omitted).

Finally, the appellants contend that "the relief sought and granted was essentially a political remedy which the district court should have avoided." This assertion is meritless. "Injunctive relief may, of course, be applied to state officials whose actions derogate federal Medicaid laws . . . ." Smith v. Miller, 665 F.2d 172, 175 (7th Cir. 1981) (citing Ex parte Young).

## V. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

## AFFIRMED.

BARKETT, Circuit Judge, concurring:

I concur in Chief Judge Hatchett's excellent opinion in this case. I write separately to explain additionally why, in my view, the Supreme Court's decision in Suter v. Artist M., 503 U.S. 347 (1992), does not mandate the conclusion that the Medicaid Act's reasonable promptness mandate, § 1396a(a)(8), may not be enforced under 42 U.S.C. § 1983.

In Suter, the Supreme Court held that plaintiffs could not enforce the reasonable efforts provision of the Adoption Assistance and Child Welfare Act of 1980

("AACWA"), 42 U.S.C. § 671(a)(15). That section provides, in relevant part, that "[i]n order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which . . . provides that, in each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home."

In concluding that plaintiffs could not enforce the reasonable efforts provision, Chief Justice Rehnquist's opinion for the Court in Suter emphasized two points. First, the Court emphasized that, unlike the substantive right to reasonable rates at issue in Wilder v. Virginia Hospital Ass'n., 496 U.S. 498 (1990), the AACWA did not mandate that a State make reasonable efforts to keep families together, but only that it have a plan approved by the Secretary of Health and Human Services that requires that reasonable efforts be made. Suter, 503 U.S. at 358 ("the Act does place a requirement on the States, but that requirement only goes so far as to ensure that the State have a plan approved by the Secretary containing the 16 listed features").

Second, the Suter Court noted that, unlike the Medicaid Act provision in Wilder, the term "reasonable efforts" was left undefined by Congress. "No further statutory guidance is found as to how 'reasonable efforts' are to be measured." Id. at 360. Nor did the agency regulations further specify the meaning of the term. The Court found it "significant . . . that the regulations are not specific and do not provide notice to the States that failure to do anything other than submit a plan with the requisite features, to be

31

approved by the Secretary, is a further condition on the receipt of funds from the Federal Government." Id. at 362.

In contrast, § 1396a(a)(8) more closely resembles the Boren Amendment at issue in Wilder than the AACWA provision in Suter. Section1396a(a)(8) not only requires States, as a condition of federal funding, to have a plan for medical assistance providing that such assistance will be provided with reasonable promptness, it also imposes a substantive duty on States to provide medical assistance with reasonable promptness. E.g. Blanco v. Anderson, 39 F.3d 969 (9th Cir. 1994). As in Wilder, "the right [guaranteed by § 1396a(a)(8)] is not merely a procedural one [that the plan provide that medical assistance be provided reasonably promptly]; rather the Act provides a substantive right to [the provision of reasonably prompt medical assistance]." Wilder, 496 U.S. at 510. As Chief Judge Hatchett's opinion demonstrates, the plain language of the Medicaid Act and its regulations make this crystal clear. This mandatory language in both the Act and its regulations puts States on notice that their provision of assistance must be reasonably prompt.

Further, unlike the AACWA provision at issue in Suter, the Medicaid regulations flesh out the meaning of the Act's reasonable promptness mandate by requiring States to provide medical assistance without any delay attributable to agency administrative processes and establishing time limits on processing Medicaid applications. Because of this further definition, it is clear that "[w]hat constitutes 'reasonable' promptness is inherently more circumscribed and judicially ascertainable than the concept of

32

'reasonable efforts' in the placement of foster children . . . ." <u>Sobky v. Smoley</u>, 855 F.

Supp. 1123, 1147 (E.D. Cal. 1994). Thus, nothing in <u>Suter</u> alters the conclusion that §

1396a(a)(8) creates enforceable rights.